Filed 5/1/23 In re J.G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| JARED G., | F085230 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CEJ300003-1) |
| v. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County. Todd Eilers, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.)

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Carlie Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Peña, Acting P. J., Snauffer, J. and DeSantos, J.

**INTRODUCTION**

Stephanie G. (mother) and Jared G. (father) are the parents of daughter J.G. (born November 2010). Father appeals from the juvenile court's order terminating his parental rights pursuant to Welfare and Institutions Code section 366.26.[1] On appeal, he contends the juvenile court erred in failing to apply the parental-benefit exception to adoption. Additionally, he contends the Fresno County Department of Social Services (department) and the juvenile court failed to comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law because paternal extended family members were not asked about J.G.'s possible Indian ancestry.[2] The department disagrees the juvenile court erred in failing to apply the parental-benefit exception, but concedes prejudicial error occurred as to ICWA.

For the reasons discussed herein, we accept the department's concession of ICWA error. Consistent with our decisions in *In re K.H.* (2022) 84 Cal.App.5th 566 (*K.H.*) and *In re E.C.* (2022) 85 Cal.App.5th 123 (*E.C.*), we conclude "the error is prejudicial because neither the [department] nor the court gathered information sufficient to ensure a reliable finding that ICWA does not apply and remanding for an adequate inquiry in the first instance is the only meaningful way to safeguard the rights at issue. ([*In re A.R.* (2021)] 11 Cal.5th [234,] 252–254 [(*A.R.*)].) Accordingly, we conditionally reverse the juvenile court's finding that ICWA does not apply and remand for further proceedings consistent with this opinion, as set forth herein." (*K.H.*, at p. 591; accord, *E.C.*, at pp. 157–158.)

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Referral, Petition, and Detention

In December 2019, the department received a referral on behalf of then nine-year-old J.G. after she was injured during a physical altercation between mother and father. At the time, there was a criminal protective order protecting mother from father. Nevertheless, she had allowed father to pick her and J.G. up. Father became upset and began driving recklessly, causing J.G. to hurt her back. Mother took her to the hospital where the referral followed.

In January 2020, the department filed a petition pursuant to section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (c) (serious emotional damage), alleging the parents exposed J.G. to ongoing domestic violence and mother suffered from substance abuse problems.[3] J.G. was detained and placed with her maternal grandmother.

At the detention hearing, the juvenile court ordered J.G. detained. Father was ordered to participate in supervised visits and was offered reunification services, including parenting classes, substance abuse, domestic violence and mental health evaluations with recommended treatment, and random drug testing. The court set a combined jurisdiction and disposition hearing.

### B. Jurisdiction and Disposition

The February 2020 jurisdiction and disposition report stated J.G. was still in placement with maternal grandmother and her significant other. J.G. reported visits with her parents were going well and she felt safe with them. She said that if she could live anywhere, she would live with maternal grandmother. Father had not given the department a statement as he had not maintained contact and had not been participating in

---

[3] An amended petition was subsequently filed making the same allegations.

services. The department recommended the allegations in the petition be found true and that father be ordered to participate in reunification services.

In July 2020, the juvenile court held a combined jurisdiction and disposition hearing and found three allegations in an amended petition true,[4] ordered father to participate in reunification services, and set a combined six- and 12-month review hearing. Visitation remained supervised.

## C.    Combined Six and 12-Month Review

The January 2021 status review report stated J.G. was still in placement with maternal grandmother. Father was now participating in reunification services. He had completed parenting classes and a substance abuse assessment, which indicated he did not require treatment. Additionally, he had completed a mental health assessment with recommended treatment (individual therapy), and a domestic violence assessment. He was in the process of completing treatment for domestic violence. He had not been participating in random drug testing. As far as visits, he had progressed to liberal visits, which consisted of overnight weekend visits. He was continuing to build an appropriate relationship with J.G. The social worker observed J.G. appeared comfortable and happy in father's care. Paternal grandmother and paternal aunt had also been participating in visits. The department reported that although father had made moderate progress in court ordered services, he had not changed his behavior sufficiently. Additionally, he also had an active warrant for his arrest related to the domestic violence incident with mother, which the department feared he would not take care of, thereby exposing J.G. to criminal matters.

Father reported he could not wait to reunify with J.G. He wanted to be the best father he could be. He said he learned from his mistakes and wanted to move forward. He apologized to J.G. and said he would do anything for her. The department opined that

---

[4]    Three allegations were withdrawn.

as long as he continued to meet his case plan objectives and continued to meet J.G.'s physical, emotional, and safety needs, reunification was likely. The department recommended father's reunification services continue.

In January 2021, the juvenile court ordered father to continue participating in reunification services and set an 18-month review hearing.

## D. Department's Request to Suspend Father's Liberal Visits

In April 2021, the department filed a Request to Change Court Order (JV-180), asking the juvenile court to suspend father's liberal visits and reinstate supervised visits due to his failure to drug test. The juvenile court granted the department's request. Father's visits were reduced to supervised visits, and he was ordered to submit to a hair follicle test.

## E. 18-Month Review

The June 2021 status review report stated J.G. was still in placement with maternal grandmother and her significant other, and they were interested in adopting her. J.G. had expressed she wished to remain with maternal grandmother and only visit father. Father had completed all services with the exception of his domestic violence treatment, which he was still participating in—he had completed 46 out of 52 classes and had zero absences. In May 2021, he submitted to a hair follicle test. The test was positive for amphetamines and methamphetamines. He denied drug use and attributed the positive result to his daily dose of aspirin that he took for his heart condition. Father was still participating consistently in visits, which, as previously mentioned, had been reduced to supervised visits. The department recommended mother and father's reunification services be terminated and that a section 366.26 hearing be set.

In September 2021, at the 18-month review hearing, the juvenile court terminated father's reunification services and set a section 366.26 hearing.

5.

**F.     Section 366.26**

The section 366.26 report, dated December 2021, stated J.G. was generally adoptable as she did not have behavioral problems or developmental delays. She was bright and did very well in school. Maternal grandmother wished to adopt her. The adoption assessment showed father was able to provide J.G. with structure, was nurturing toward her, was able to challenge her, and engaged her appropriately during visits. However, the department repeatedly noted J.G. had been out of father's care since January 2020 and he had not shown he could provide for her needs on a day-to-day basis. The department stated J.G. was in need of stability and continuity and would benefit from adoption. Due to the parents' history of domestic violence and criminal behavior, adoption was in J.G.'s best interest. The department opined it would not be detrimental to terminate parental rights. Maternal grandmother was open to maintaining contact between J.G. and the parents under her supervision if it was in J.G.'s best interest. The department recommended terminating parental rights with a permanent plan of adoption.

An addendum report dated June 2022 stated J.G. continued to visit with father at a supervised visitation center. She reported she enjoyed going to visits with father, but looked forward to returning home with maternal grandmother. A social worker asked J.G. if she understood what adoption meant. J.G. nodded her head and stated she understood it meant "her parents would no longer be her parents legally." She said although her parents would always be her parents, she felt safe and loved in maternal grandmother's home. She explained maternal grandmother and her significant other were "able to meet her emotional needs as they constantly shower[ed] her with love and assurance." The social worker asked her how she felt about being in a plan of guardianship where her parents could petition for custody of her if they became more stable. "[J.G.'s] face froze as she appeared to digest that information before stating, 'No, I like where I'm at right now.' " She seemed stressed, and stopped talking and walked away. The report summarized that J.G. had now been living with maternal grandmother

6.

for well over two and a half years. She was thriving in placement and excelling in school. When J.G. was in the parents' care, she had not been able to attend school, but was now catching up. Maternal grandmother was still committed to adopting her. The department again recommended terminating parental rights with a permanent plan of adoption.

An addendum report dated August 2022, stated father continued to visit with J.G. Father described the visits as " 'awesome' " and reported they had a great relationship. The report summarized that father had been consistent with visits, but continued to fail to take responsibility for his actions. He did not appear to understand that the frequent domestic violence witnessed by J.G. may have had an impact on her. Additionally, he blamed his job loss on having to complete court-ordered services although he had not been ordered to complete any more services for almost a year (since September 2021). Probation in his criminal matter had also ended, but he claimed he was required to do 18 hours of community service per week. His probation officer confirmed probation had ended in September 2021, and he was not required to do community service. The department again recommended terminating parental rights with a permanent plan of adoption.

In September 2022, the juvenile court held a section 366.26 hearing. Father objected to the department's adoption recommendation and raised the parental-benefit exception. He testified he and mother were married at the time of J.G.'s birth and he was her primary caretaker. He and mother had separated approximately four months prior to her removal. During the four months of separation, he remained J.G.'s primary caretaker. Prior to removal, he and J.G. had an "incredible" relationship. He said they loved each other and shared a bond. After her removal, he was consistent with visitation. He said they had a lot of fun during visits. They watched movies and talked about school and J.G.'s feelings. He asked her if she had any problems and reinforced that she could talk to him about it. He would try to make her smile and feel better. He showed her love and

7.

affection. At the beginning of visits, she would run and hug him. She would tell him she missed and loved him, and he would do the same. He said their relationship was the same as it was prior to removal.

When asked about the kind of structure he felt they had during visits, he said he took on a father role. He did not feel there was a change in their bond since removal. Regarding providing nurture during visits, he said they talked a lot and played games. Their visits went by "super fast." He said visits began happy because they were glad to see each other and then they would become "more … relaxed." J.G. was very clingy with him. She would lay on him, hold his hand, and was very loveable. She sometimes took her homework to visits, and he would help her with it. When asked how he engaged with her during visits, he said they drew and played games. At the end of visits, she would express disappointment. Sometimes she would say she did not want to leave or could not wait until the next visit. Regarding whether he could provide J.G. with stability, he said he was seeking employment. Additionally, father testified J.G. had been visiting with paternal grandmother and paternal aunt and was very bonded to them.

In ruling, the juvenile court found father had satisfied the first two prongs of the parental-benefit exception—that father visited consistently and there was a beneficial relationship between father and J.G. However, the juvenile court found prong three—detriment to J.G.—had not been satisfied, and stated as follows:

> "The third prong is whether or not terminating that attachment would be detrimental to the child, even when balanced against the benefit of the new adoptive home. Frankly, that's really what this case is about, is about prong three.

> "The reason the [c]ourt asked about the schooling is because according to the reports—in the addendum reported dated June the 29th, it says that the minor's excelling in school, and that the care providers are proactive in her education, and that all of her educational needs are being met and she's on target.

"The report goes on to note that she was not attending school when previously in the care of her parents. When the [c]ourt looks at the stability, father testified he's not currently working as he was trying to complete his community service. However, the report indicates that his probation ended in September of 2021, so a year ago. There was no community service to complete. [¶] It gives the [c]ourt concern that father's reasoning for not having an occupation is because he was still working on community service, when there was none to complete as probation ended in 2021.

"Additionally, when the [c]ourt looks at the stability, the father having the domestic violence conviction, having a positive test for methamphetamine, versus a minor who is essentially excelling in school as indicated in the reports. Additionally in the reports, while the minor indicates that the visits are good and she has fun, the report also indicates that the minor is excited to return home.

"When the visits are over she says, 'I'm ready to go back home'—meaning to the care provider. These decisions are always difficult, especially when the minors are of the age that this minor is.

"There's no doubt that the father loves his daughter, but [father] you have to understand that the decisions are based on not whether it'd be beneficial to you to continue with that relationship, but whether it's beneficial for the minor. And the father's testimony when asked, 'Would it be detrimental to terminate that relationship,' the first answer he had was, 'I would not be in her life'—not that it would be detrimental to her, but that it would be detrimental to him.

"The report indicates that the minor loves her mother and her father, and indicates that they will always be her parents. However, she loves staying with her grandparents, and feels happy and safe there.

"The other evidence that the [c]ourt strongly considered is that the minor is mature, old enough to express how she feels, old enough to express what she wants and understand what is happening with this [c]ourt proceeding.

"The evidence is that when it was explained to the minor that if the [c]ourt granted legal guardianship that if the parents were more stable they could petition to set aside the guardianship and have the minor in [their] care, and when that was explained to her [J.G.'s] face fell and she stated, 'No, I like it where I'm at.'

9.

"The report indicates that the minor appeared to be stressed and stopped talking and walked away. So at the end of the day the [c]ourt has to determine whether or not the extent of that relationship outweighs the benefit of the new adoptive home. Based on all of the evidence that's before this [c]ourt, the [c]ourt cannot say that that benefit outweighs the benefit of the new adoptive home and the stability it would provide to [J.G.]."

The juvenile court then terminated parental rights and selected adoption as the permanent plan after finding there was clear and convincing evidence J.G. was likely to be adopted.

On November 4, 2022, father filed a notice of appeal.

## DISCUSSION

### I.  Parental-Benefit Exception

#### A.  Legal Principles

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[T]he goal at the section 366.26 hearing is 'specifically … to select and implement a permanent plan for the child.' " (*Ibid*.) "At [the] hearing, the court may order one of three alternatives:  adoption, guardianship or long-term foster care." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "According to [the] procedure [under section 366.26], the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.]  If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630–631.)  One exception to adoption is the parental-benefit exception, which requires the parent to establish, by a preponderance of the evidence, "that the parent has regularly visited with the child, that

the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Id.* at p. 629; § 366.26, subd. (c)(1)(B)(i).)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is on the best interests of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child …." (*Ibid.*)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) "[T]he effects [on the child] might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet … a new, stable home may alleviate the emotional

11.

instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid*.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," and it "should not look to whether the parent can provide a home for the child." (*Id.* at p. 634.) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid*.) "[T]he section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Ibid*.)

Moreover, "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) "[W]hen the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Ibid*.) "The parental-benefit exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency." (*Ibid*.) Thus, "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Ibid*.) However, lack of progress is not irrelevant. "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid*.) "Conversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" … effect' on them." (*Id.* at pp. 637–638.) "In both scenarios, the parent's struggles speak to the benefit (or lack thereof) of continuing the relationship and are

relevant to that extent." (*Id.* at p. 638.) They "may also be relevant to the detriment from terminating parental rights." (*Ibid.*)

**B.     Standard of Review**

The first two elements are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.) The third element is reviewed for abuse of discretion. (*Ibid.*) A court abuses its discretion only when it " 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.)

**C.     Analysis**

In order to establish the parental-benefit exception, father was required to show, by a preponderance of the evidence, that (1) he regularly visited J.G., (2) J.G. would benefit from continuing the relationship, and (3) terminating the relationship would be detrimental to J.G. (*Caden C.*, *supra*, 11 Cal.5th at p. 629; § 366.26, subd. (c)(1)(B)(i).) Here, the juvenile court found father had satisfied the first two elements, but found the third element had not been established.

Regarding the first element—regular visitation and contact—we find substantial evidence supports the juvenile court's determination that father maintained regular visitation with J.G. The department's reports show father visited consistently.

As for the second element—whether J.G. would benefit from continuing the relationship—we find substantial evidence supports the juvenile court's determination that J.G. and father had a beneficial relationship. J.G. had lived with father up until she was nine years old. After removal, he maintained regular contact with her, thereby preserving the relationship. J.G. reported she enjoyed visiting him. She described the visits as " 'good' " and " 'fun.' " They would tell each other they loved and missed one another. They played games, talked, and drew. Father showed an interest in her life by asking about school and her feelings. J.G. would sometimes take her homework to visits and father would help her. She appeared comfortable and happy in father's care. Accordingly, we find substantial evidence supports the juvenile court's finding.

We note, however, that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315–1316.) " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) That appears to be the case here.

Turning to the third element—"whether 'termination would be detrimental to the child due to' the relationship"—we find the juvenile court did not abuse its discretion in failing to find detriment. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) As noted, when it comes to the third element, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a

14.

new, adoptive home." (*Id.* at p. 634.) Although J.G. stated she enjoyed visiting with father, she consistently reported she wanted to live with maternal grandmother. She said she only wanted to visit father. J.G. expressed that her parents would always be her parents, but that she felt safe and loved with maternal grandmother. She understood adoption meant her parents would not legally be her parents anymore. Although she expressed she wanted to continue visiting father, when the social worker explained that if she were in a plan of guardianship, her parents could petition for custody if they became more stable, she became stressed. Her face froze and then she stated, " 'No, I like where I'm at right now.' " She then stopped talking and walked away. The record shows not only that J.G. wanted to remain in maternal grandmother's care, but that she was thriving in her care. She was excelling in school, whereas she had been unable to attend school while in the parents' care. Prior referrals showed she had excessive tardies and absences while in the parents' care. One referral showed 105 tardies and 46 absences in one school year. Thus, we find the court did not abuse its discretion in finding that any detriment J.G. would suffer by losing her relationship with father would be outweighed by the security of a new, adoptive home. (*Id.* at p. 634.) Accordingly, the court did not err in failing to apply the parental-benefit exception.

## II.    ICWA

Father next contends the department and the juvenile court failed to comply with the inquiry requirements of ICWA and related state law because paternal extended family members were not asked about J.G.'s possible Indian ancestry.

### A.    Additional Background

The petition contained an Indian Child Inquiry Attachment form (ICWA-010(A)) stating J.G. had no known Indian ancestry.

The detention report stated ICWA did not apply. Mother had denied Indian ancestry, but the department stated it had not inquired of father.

In January 2020, mother and father each filed Parental Notification of Indian Status forms (ICWA-020) stating they did not have Indian ancestry as far as they knew.

The jurisdiction and disposition report stated ICWA did not apply and referred to mother and father's ICWA-020 forms.

In July 2020, at the combined jurisdiction and disposition hearing, the juvenile court held ICWA did not apply.

The six- and 12-month and 18-month status review reports stated ICWA did not apply.

In October 2021, the department conducted a new inquiry with maternal grandmother as mother's whereabouts were unknown. Maternal grandmother reported their family did not have Indian ancestry.

In December 2021, the department conducted a new ICWA inquiry with father and he did not provide any new information.

The section 366.26 report recommended the juvenile court find ICWA inapplicable.

### B.    Legal Principles

" 'ICWA is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation' [citations], in furtherance of 'federal policy " 'that, where possible, an Indian child should remain in the Indian community' " ' [citations]. 'ICWA establishes minimum federal standards, both procedural and substantive, governing the removal of Indian children from their families' [citations], and '[w]hen ICWA applies, the Indian tribe has a right to intervene in or exercise jurisdiction over the proceeding.' " (*K.H.*, *supra*, 84 Cal.App.5th 566, 594, fn. omitted; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 138, fn. omitted.)

" 'In 2006, California adopted various procedural and substantive provisions of ICWA.' [Citations.] The Legislature's 'primary objective … was to *increase* compliance with ICWA. California Indian Legal Services (CILS), a proponent of the

16.

bill, observed that courts and county agencies still had difficulty complying with ICWA 25 years after its enactment, and CILS believed codification of [ICWA's] requirements into state law would help alleviate the problem. [Citation.]' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 595; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 138–139.)

" 'In 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 ….' [Citation.] Subsequently, the Legislature amended section 224.2, subdivision (e), to define 'reason to believe,' effective September 18, 2020." (*K.H.*, *supra*, 84 Cal.App.5th at pp. 595–596, fn. omitted; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 139.)

### 1. Summary of Duties of Inquiry and Notice

"[W]hether a child is a member, or is eligible for membership, in a particular tribe is a determination that rests exclusively with the tribe, and neither the [department] nor the court plays any role in making that determination. [Citations.] ' "Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case." ' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 596; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 139–140.)

"In California, section 224.2 'codifies and elaborates on ICWA's requirements of notice to a child's parents or legal guardian, Indian custodian, and Indian tribe, and to the [Bureau of Indian Affairs].' " (*In re A.R.* (2022) 77 Cal.App.5th 197, 204.) California law imposes "an affirmative and continuing duty [on the court and the county welfare department] to inquire whether a child for whom a petition under [s]ection 300, … may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).)

"The [state law] duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any

17.

information that the child may be an Indian child." (§ 224.2, subd. (a).) "If a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306 … the county welfare department … has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Additionally, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable." (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 999 (*Ezequiel G.*), citing § 224.2, subd. (e).) "Further inquiry 'includes, but is not limited to, all of the following: [¶] (A) Interviewing the parents, Indian custodian, and extended family members[;] [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services[; and] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' " (*Ezequiel G.*, at p. 999.)

"If there is 'reason to know' a child is an Indian child, the [department] shall provide notice to the relevant tribes and agencies in accordance with section 224.3, subdivision (a)(5)." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 999, citing § 224.2,

subd. (f).) "There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*Ezequiel G.*, at p. 999, citing § 224.2, subd. (d).)

County welfare departments "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (Cal. Rules of Court, rule 5.481(a)(5).)[5]

### C.     Analysis

#### 1.     Summary of ICWA Inquiry and Notice

In the present case, mother and father both filed ICWA-020 forms denying Indian ancestry at the time of the detention hearing. At the combined jurisdiction and disposition hearing, the juvenile court found ICWA did not apply. Prior to the section 366.26 hearing, the department conducted a new inquiry with father, but he did not provide any new information. The department was unable to conduct a new inquiry with mother because her whereabouts were unknown, but conducted an inquiry with maternal grandmother who reported the family did not have Indian ancestry. It is unclear whether the juvenile court conducted its own inquiries as the record only contains transcripts of the section 366.26 hearings. Moreover, it does not appear paternal extended family members were asked about J.G.'s possible Indian ancestry. The record shows at least three paternal family members were involved in the proceedings. Early in the case, paternal aunt Justine L., paternal uncle Kenny L., and paternal grandmother

---

[5]     All further references to rules are to the California Rules of Court.

Terri G. participated in a team decision making meeting. Paternal grandmother and Justine remained in contact with the department for placement purposes, and participated in ongoing visitation and attended hearings.

Father contends the department's failure to conduct inquires with paternal extended family members resulted in prejudicial error. The department concedes.

In *K.H.* and *E.C.*, we addressed ICWA error at the inquiry stage. There, we explained our decision not to follow the approaches articulated by other appellate courts for determining whether ICWA error requires reversal and concluded that the Supreme Court's decision in *A.R.* supplies the appropriate framework for assessing prejudice in this context. (*K.H.*, *supra*, 84 Cal.App.5th at pp. 607–608, citing *A.R.*, *supra*, 11 Cal.5th at pp. 252–254; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 152.) Applying the standards we articulated in *K.H.* and *E.C.*, as we will discuss below, we agree with the parties and conclude the department's error is prejudicial and remand for the department to conduct a proper, adequate, and duly diligent inquiry is necessary.

## 2. Standard of Review

"The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.'" (*K.H.*, *supra*, 84 Cal.App.5th at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 142–143.) First, "[t]he court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply." (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2); accord, *E.C.*, *supra*, at p. 143.) Second, "[t]he juvenile court must … find a 'proper and adequate further inquiry and due diligence ….'" (*Ibid.*)

Under the substantial evidence standard, "'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The determinations should "be upheld if … supported by substantial

evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.] The standard recognizes that '[t]rial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record' [citation]. '[I]f a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 601; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 143.)

The juvenile court's finding on the second element, however, "is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the [department's] inquiry was proper and adequate within the context of ICWA and California law, and whether the [department] acted with due diligence." (*K.H.*, *supra*, 84 Cal.App.5th at p. 601, quoting *Caden C.*, *supra*, 11 Cal.5th at p. 640; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 143; *Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1004–1005.) Therefore, we employ a hybrid standard and review the court's determination for substantial evidence and abuse of discretion. (*K.H.*, at p. 601; accord, *E.C.*, at pp. 143–144; *Ezequiel G.*, at pp. 1004–1005.)

" 'Review for abuse of discretion is subtly different [from review for substantial evidence], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " [Citation.] But " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court" ' " [Citations.] [¶] While each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 602; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 143–144.)

"Review of the juvenile court's findings under the foregoing standards is deferential, but ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." ' [Citations.] Where the material facts are undisputed, courts have applied independent review to determine whether ICWA's requirements were satisfied." (*K.H.*, *supra*, 84 Cal.App.5th at p. 602; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 144.)

### 3.    Department and Juvenile Court Erred

As previously mentioned, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).) Moreover, when "a child is placed into the temporary custody of a county welfare department …, the county welfare department … has a duty to inquire whether [the] child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Extended family members include adult grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Here, the department inquired only of father on the paternal side of the family, which fell short of complying with the plain language of section 224.2, subdivision (b), which required the department to inquire of extended family members. "[T]he law demands more than merely inquiring of [a parent]" (*K.H.*, *supra*, 84 Cal.App.5th at p. 620, citing *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431; accord, *In re M.M.* (2022) 81 Cal.App.5th 61, 74, review granted Oct. 12, 2022, S276099 (dis. opn. of Wiley, J.)), a point the department does not dispute. There may be cases in which there is no one else

to ask, but if that is so, the record must be developed to reflect that fact and supported by documentation. (Rule 5.481(a)(5).) "On a well-developed record, the court has relatively broad discretion [in such cases] to determine [that] the [department's] inquiry was proper, adequate, and duly diligent on the specific facts of the case." (*K.H.*, at p. 589; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 157.) Accordingly, the juvenile court's finding that ICWA did not apply was not supported by substantial evidence, and its contrary conclusion was an abuse of discretion. (§ 224.2, subd. (i)(2).)

### 4. Prejudice

"Where, as here, the deficiency lies with the [department's] duty of […] inquiry and a juvenile court's related finding of 'proper and adequate further inquiry and due diligence' (§ 224.2, subd. (i)(2)), the error is one of state law ([*In re*] *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742). Under the California Constitution, '[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*K.H.*, *supra*, 84 Cal.App.5th at p. 606; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 151.)

" '[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of justice' [citations], and California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error.' " (*K.H.*, *supra*, 84 Cal.App.5th at pp. 606–607; accord, *E.C.*, *supra*, 85 Cal.App.5th at pp. 151–152.)

However, in *A.R.*, the Supreme Court "recognized that while we generally apply a *Watson*[6] likelihood-of-success test to assess prejudice, a merits-based outcome-focused test is not always appropriate because it cannot always adequately measure the relevant harm. [Citation.] In other words, where the injury caused by the error is unrelated to an outcome on the merits, tethering the showing of prejudice to such an outcome misplaces the measure, at the expense of the rights the law in question was designed to protect." (*K.H.*, *supra*, 84 Cal.App.5th at p. 609, italics omitted.)

As we explained in *K.H.*, " 'ICWA compliance presents a unique situation ....' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 608.) "ICWA is not directed at reaching, or protecting, a specific outcome on the merits." (*Id.* at p. 609; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 154.) Rather, " '[t]he purpose of ICWA and related California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings' [citation], and an adequate initial inquiry facilitates the information gathering upon which the court's ICWA determination will rest." (*K.H.*, at p. 608; accord, *E.C.*, at pp. 152–153.) Yet, "while the appealing party is usually a parent, parents do not bear the burden of gathering information in compliance with ICWA [citations], and parents may raise the claim of error for the first time on appeal." (*K.H.*, at p. 608; accord, *E.C.*, at p. 153.) Further, the ultimate determination whether a child is an Indian child rests with the tribe, not with a parent, the department, or the juvenile court. (*K.H.*, at p. 590; accord, *E.C.*, at pp. 139–140.) "[W]here the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H.*, at p. 610, citing *A.R.*, *supra*, 11 Cal.5th at pp. 252–254; accord, *E.C.*, at p. 155.)

---

**6**      *People v. Watson* (1956) 46 Cal.2d 818, 836.

Here, the department's inquiry, limited only to father on the paternal side of the family, " 'fell well short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 156, quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 620), and "[a] finding of harmlessness on this record would necessarily require speculation and 'is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes.' " (*E.C.*, at p. 155, quoting *K.H.*, at p. 611.) Therefore, the error is prejudicial and reversal is required.

Accordingly, the juvenile court's finding that ICWA does not apply is conditionally reversed and the matter is remanded. The juvenile court is instructed to ensure the department conducts " 'a proper, adequate, and duly diligent inquiry under section 224.2, subdivision[s] (b) [and (e)], and document its inquiry in the record in compliance with rule 5.481(a)(5).' " (*E.C.*, *supra*, 85 Cal.App.5th at p. 157, quoting *K.H.*, *supra*, 84 Cal.App.5th at p. 621.) " 'This should not be interpreted as requiring an exhaustive search for and questioning of every living relative of [J.G.]' but '[w]e leave that determination for the juvenile court in the first instance because it is better positioned to evaluate the evidence provided by the [d]epartment. So long as the court ensures the inquiry is reasonable and of sufficient reach to accomplish the legislative purpose underlying ICWA and related California law, the court will have an adequate factual foundation upon which to make its ICWA finding. (§ 224.2, subd. (i)(2).)' " (*Ibid.*)

## DISPOSITION

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the department to comply with the inquiry and documentation provisions set forth in section 224.2, subdivisions (b) and (e), and rule 5.481(a)(5). The juvenile court is directed to comply with the inquiry provisions of section 224.2, subdivision (c). If, after determining that an adequate inquiry was made consistent with the reasoning in this opinion, the court finds

25.

that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated. In all other respects, the juvenile court's order is affirmed.